UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TRAVIS R. MCPEEK, | 4:23-CV-04025-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| KELLIE WASKO, SECRETARY OF CORRECTIONS, INDIVIDUAL AND OFFICIAL CAPACITY; BRENT FLUKE, FORMER WARDEN AT THE MIKE DURFEE STATE PRISON, INDIVIDUAL CAPACITY; AARON HAYNES, SD DOC MEDICAL DIRECTOR, INDIVIDUAL AND OFFICIAL CAPACITY; LIZ PAUL, MEDICAL PROVIDER, INDIVIDUAL AND OFFICIAL CAPACITY; ALEX REYES, ACTING WARDEN AT THE MIKE DURFEE STATE PRISON, OFFICIAL CAPACITY, | |
| Defendants. | |

Plaintiff Travis R. McPeek, an inmate at Mike Durfee State Penitentiary (MDSP), filed this pro se lawsuit under 42 U.S.C. § 1983. Docs. 1, 10. This Court screened McPeek's amended complaint under 28 U.S.C. § 1915A, dismissing the amended complaint in part and directing service upon defendants in part. Doc. 12. After screening McPeek's amended complaint, this Court granted McPeek's motion for leave to file a second amended complaint to correct a date, identify a Department of Corrections (DOC) staff member who is not a defendant, and correct spelling errors. Doc. 17 at 2. This Court also granted McPeek leave to file a third amended

complaint to substitute Liz Paul, a medical provider at MDSP, for the Jane/John Doe Medical Providers(s). Doc. 34 at 2–3.

McPeek brings Eighth Amendment deliberate indifference to unsafe conditions of confinement claims against Kellie Wasko, Secretary of Corrections, and Brent Fluke, the former Warden of the MDSP. Doc. 12 at 16. McPeek alleges that he contracted COVID-19 while incarcerated at MDSP because Wasko and Fluke disregarded COVID-19 guidelines of the Center for Disease Control and Prevention (CDC), failed to test or screen staff for the virus, did not require staff to get COVID-19 vaccinations, and failed to follow adequate sanitation and disinfection measures. Doc. 35 ¶ 12. He also alleges that Wasko and Fluke refused to allow him to wear a stocking hat that he purchased on cold days and that inmates are not issued appropriate cold weather clothing. Id. ¶ 13. The allegedly inadequate winter clothing, according to McPeek, heightens exposure to serious, easily communicable diseases. Id.

McPeek also brings Eighth Amendment deliberate indifference to serious medical needs claims against Dr. Aaron Haynes, the Medical Director of the South Dakota Department of Corrections (SDDOC) and Liz Paul, a medical provider at MDSP. Doc. 35 ¶¶ 6, 7. McPeek's claims against Dr. Haynes and Certified Nurse Practitioner (CNP) Paul arise from the discontinuation of Lyrica, a medication that McPeek had been prescribed for chronic pain stemming from a 2004 motor vehicle accident. Id. ¶ 16.

Defendants move for summary judgment. Doc. 44. McPeek opposes Defendants' motion for summary judgment. Docs. 56, 57, 67.

## FACTUAL BACKGROUND

Defendants complied with Rule 56.1(A) of this Court's Local Rules by filing a statement of material facts along with their motion for summary judgment. Doc. 49. Civil Local Rule

56.1(B) required McPeek to "respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1(B); see also Fed. R. Civ. P. 56(e)(2) (stating that the court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). McPeek responded to Defendants' statement of undisputed material facts, but he did not provide appropriate citations to the record. Docs. 56, 67. Although a court is not required to "plumb the record in order to find a genuine issue of material fact," Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996), this Court will consider any specific, non-conclusory facts alleged in McPeek's complaint, exhibits, and other filings pertaining to Defendants' motion for summary judgment. See Nickens v. White, 622 F.2d 967, 971 (8th Cir.1980); Roberson v. Hayti Police Dep't, 241 F.3d 992, 995 (8th Cir. 2001) ("[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion."); see also McClanahan v. Young, 4:13–CV–04140–RAL, 2016 WL 520983, at *1. This Opinion and Order, of course, makes no findings of fact and sets forth the facts in the light most favorable to McPeek, as it must in ruling on Defendants' motion for summary judgment.

McPeek tested positive for COVID-19 on October 22, 2020. Doc. 35 ¶ 9; Doc. 1-1 at 1–2. McPeek contends that he contracted the virus "due to staff bringing it into the facility and exposing him to it." Doc. 35 ¶ 9. Defendant Kellie Wasko has been the South Dakota Secretary of Corrections since May 7, 2022. Doc. 46 ¶ 1. Defendant Brent Fluke served as the Warden of MDSP from June 20, 2018, until November 22, 2023, when he was appointed to serve as the Deputy Director of Prison Operations for the SDDOC. Doc. 47 ¶ 1.

According to McPeek, because Fluke and Wasko failed to follow CDC guidelines, he was "susceptible to heightened exposure to a serious easily communicable disease." Doc. 35 ¶ 12.

3

Specifically, McPeek alleges that Fluke and Wasko violated social distancing guidelines by making him "stand in close proximity to other prisoners during count times, while in lines to eat or get medication," and while eating. Id. McPeek asserts that he was "forced to live in a very confined room with two other prisoners because of overcrowding." Id. He contends that Fluke and Wasko failed to "[f]ollow adequate sanitation and disinfection measures[,]" causing him to be "intentionally expos[ed] . . . to filth, viruses and bacteria" when he and "approximately 78 other prisoners [were required] to share 4 bars of soap in the restroom." Id.

In September 2019, the SDDOC adopted and implemented an Influenza Vaccine Control Plan, SDDOC Policy 1.1C.15. Doc. 47 ¶ 18; Doc. 49 ¶ 29; Doc. 45-2. MDSP took measures to mitigate the spread of the COVID-19 virus, some of which were based on provisions of the Influenza Vaccine Control Plan. Doc. 49 ¶¶ 40, 42, 44. Fluke could not mandate or require MDSP staff to be vaccinated. Doc. 49 ¶ 36. But vaccinations were offered and made readily available to staff and inmates. Id. ¶ 37. Before each shift, MDSP staff were screened for symptoms, which included having their temperature taken. Id. ¶ 38. Testing kits were made available at no charge to all staff. Id. ¶ 39. All staff were required to wear a mask when entering the facility. Id. All inmates were issued masks, which they were required to wear when they were out of their rooms. Id.

To limit interaction between inmates, MDSP changed the way medications were dispensed. Id. ¶ 40. The CDC's Guidance on Prevention and Management of Coronovirus Disease (COVID-19) in Correctional Detention Facilities refers to rearranging chairs in the dining hall to increase distance between inmates or using protective barriers if space is limited. Id. ¶ 41. A divider was placed down the middle of the tables in the dining hall at MDSP. Id. ¶ 42. Additionally, inmates were required to eat only with other inmates who lived in the same housing unit. Id. ¶ 44. Hand

4

sanitizers were made available to inmates, and all inmates were required to use hand sanitizer before attending meals. Id. ¶ 45.

McPeek submitted a project application dated September 20, 2020, complaining that sharing of bar soap is unsanitary and requesting that liquid soap dispensers be placed on the wall for every sink and shower in each housing unit. Doc. 56-1 at 11. McPeek's project application was denied. Id.; Doc. 49 ¶ 47. Staff determined that inmates might break or attempt to steal the soap dispensers. Doc. 49 ¶ 47. Instead, inmates were issued two personal bars of soap a week. Id. ¶ 48; Doc. 56-1 at 12. McPeek disputes that he has ever been issued two bars of soap a week. Doc. 56 ¶ 48. McPeek submitted declarations from other inmates disputing that they had been issued two bars of soap a week. Doc. 56-1 at 15, 18, 21, 24, 27, 30, and 33.

On May 1, 2020, McPeek submitted a grievance regarding a policy or rule that was implemented on April 29, 2020, that prohibited him from wearing a stocking cap and impaired him from protecting his ears and head on cold, windy, rainy days. Doc. 56-1 at 6. In response, McPeek was informed that during warmer weather in the spring and summer, MDSP exchanges stocking caps for baseball caps. Id. at 7. Inmates are permitted to possess only one hat to maintain safe and appropriate property levels. Id. It is undisputed that inmates are allowed to wear stocking hats while outside in the fall and winter. Doc. 49 ¶ 80; Doc. 56 ¶ 80.

McPeek submitted a project application dated September 17, 2020, "for inmates to be allowed to purchase thermal tops and bottoms to provide an additional barrier for warmth in the cold weather." Doc. 56-1 at 12. The project application was rejected because thermals are issued to inmates, and inmates may purchase sweatpants and sweatshirts. Id. It is undisputed that inmates are provided a green winter parka coat with a hood the inmate may use to cover his head while outside on cold days, although McPeek contends inmates at times may have to wait a week to

receive a hood for their parka. Doc. 49 ¶ 79; Doc. 56 ¶¶ 78, 79. Inmates are issued gloves, and those inmates who have outside jobs are issued thermal tops and bottoms. Doc. 45-24; Doc. 49 ¶ 48; Doc. 56 ¶ 78. McPeek does not allege and has submitted no evidence that he works outside.

Although McPeek has not again tested positive for COVID-19, Doc. 49 ¶ 50; Doc. 56 ¶ 50, McPeek alleges that he has continued to experience ongoing symptoms he attributes to his initial diagnosis. Specifically, he contends that he has suffered excruciating headaches, "covid fog," breathing issues, and possible long term memory issues. Doc. 56 ¶ 76. He asserts that unidentified medical staff told him that he may have scarring on his lungs "from having contracted the Covid-19 virus while at MDSP." Doc. 56 ¶ 74. Defendants dispute that McPeek developed any serious complications after testing positive for COVID-19. Doc. 49 ¶ 76.

Because of a 2004 motor vehicle accident, McPeek experiences ongoing medical issues including fibromyalgia, myofascial and tissue damage, spleen scarring, and neuropathy. Doc. 35 ¶ 16. McPeek was prescribed Lyrica for his chronic medical conditions. Id.

Formulary medications are the medications that DOC medical providers can prescribe without approval from the medical director. Doc. 45-73 at 1. Defendant Liz Paul is a CNP at MDSP. Doc. 62 ¶ 2. On December 5, 2022, CNP Paul discussed with McPeek "the recent change in formulary medications and that Lyrica no longer falls on the formulary list." Doc. 45-14 at 5. Lyrica is a primary drug of abuse in the prison population and is actively sought after by many inmates because of a perceived initial euphoric potential followed by sedative properties. Doc. 49 ¶ 142. Because Lyrica is commonly sought after by the inmate population, prescribing Lyrica can lead to bullying and extortion. Id. ¶ 143. Lyrica can also potentiate the effects of other abusable substances that could be fatal. Id. Accordingly, in Dr. Haynes' opinion, prison officials must do what they can to restrict the use of Lyrica. Id. ¶ 144. Lyrica remains available through the

nonformulary process, but its use is limited to those inmates who have a documented medical need for the medication. Id. ¶ 146. Interventions other than Lyrica such as exercise, physical therapy, joint injections, surgery, NSAIDS, Tylenol, TENS unit, dietary supplements, and sodium channel modulators are used as part of a multimodal pain management approach. Doc. 49 ¶ 145; Doc. 56 ¶ 145.

CNP Paul submitted for McPeek a non-formulary request for Lyrica on December 5, 2022, but the request was rejected. Doc. 45-67. After the non-formulary request for Lyrica was rejected, CNP Paul ordered that McPeek's Lyrica be titrated. Id.; Doc. 49 ¶ 130; Doc. 56 ¶ 130. By correspondence dated December 15, 2022, McPeek was informed that his Lyrica prescription expires in January, a provider had rejected a renewal request, and "the provider will order a titration to slowly reduce your Lyrica." Doc. 47-68; Doc. 49 ¶ 131; Doc. 56 ¶ 131. On December 26, 2022, McPeek reported to nursing staff panic attacks due to concern with Lyrica getting discontinued. Doc. 47-69 at 1; Doc. 49 ¶ 132; Doc. 49 ¶ 132; Doc. 56 ¶ 132. In response, a provider, who is not a named defendant, replied that "[h]is anxiety is understandable. I would be willing to start him on cymbalta for joint pain if he would be interested." Doc. 45-69 at 2; Doc. 49 ¶ 13; Doc. 56 ¶ 133. On January 1, 2023, McPeek advised nursing staff that "he has no interest in starting Cymbalta, has tried it before and it doesn't help. States the only thing that helps is Lyrica." Doc. 45-70; Doc. 49 ¶¶ 133, 134; Doc. 56 ¶¶ 133, 134.

On January 1, 2023, McPeek requested an explanation why he was being taken off Lyrica. Doc. 45-71; Doc. 49 ¶ 135; Doc. 56 ¶ 135. McPeek was informed that he had been educated on December 5, 2022, that "the new formulary does not include Lyrica." Doc. 45-72 at 1. McPeek was further informed that "[a] request to continue Lyrica was submitted and was not approved at this time. You were offered and refused Cymbalta as an alternative on 1/1/23." Id.; Doc. 49 ¶ 136;

7

Doc. 56 ¶ 137. Finally, McPeek was informed that "[r]esearch shows that the medication, Cymbalta, is the first line of treatment for . . . [f]ibromyalgia. The provider recommends starting Cymbalta and being compliant with that medication for greater than 1 month to determine if it is effective or not." Doc. 45-72; Doc. 49 ¶ 137; Doc. 56 ¶ 137.

On January 23, 2023, McPeek was notified that the medical director had reviewed his chart, determined that Cymbalta is not listed as a medication allergy, and determined that Cymbalta would need to be prescribed and trialed for at least one month before reconsidering a non-formulary request for Lyrica. Doc. 45-73 at 1. McPeek was instructed to kite medical for sick call if he wanted to trial Cymbalta. Id. McPeek contends that he had experienced "allergic like reactions to Cymbalta" that Dr. Haynes should have taken seriously. Doc. 56 ¶ 139. It is undisputed that McPeek's DOC medical records do not document a Cymbalta allergy. Doc. 49 ¶ 140; Doc. 56 ¶ 140.

McPeek was seen by CNP Paul in Health Services on February 10, 2023, to review the results of a cervical MRI. Doc. 45-74. McPeek reported chronic shoulder pain, with the pain worse on the right side. Id. at 3. He also reported that his pain was worse since titrating off Lyrica. Id.; Doc. 49 ¶ 140; Doc. 56 ¶ 140. CNP Paul documented that McPeek "has a self reported adverse reaction to Cymbalta." Doc. 45-74 at 3; Doc. 49 ¶ 140; Doc. 56 ¶ 140. Because the MRI did not show any stenosis, CNP Paul informed McPeek he could seek physical therapy and use a TENS unit. Doc. 45-74 at 5; Doc. 49 ¶ 176; Doc. 56 ¶ 175. CNP Paul suggested anti-anxiety medication for treatment of fibromyalgia. Doc. 45-74 at 4–5; Doc. 49 ¶ 141; Doc. 56 ¶ 141. During the February 10, 2023 encounter, McPeek admitted that he was under quite a bit of stress and was willing to see mental health to consider anti-anxiety medication. Doc. 45-74 at 5; Doc. 49 ¶ 141; Doc. 56 ¶ 141. McPeek contends that he was under stress because he had been taken off a

8

medication that worked for his chronic pain and was experiencing "withdrawals from being taken off his medication so soon and Defendants [sic] games of coercion and bribery of the Lyrica." Doc. 56 ¶ 141. There is no reference in the February 10, 2023 medical record to withdrawal symptoms. Doc. 45-74; Doc. 49 ¶ 175.

In his complaint, McPeek alleges that he saw a "medical provider[1] around February 9, 2023 at which time he explained how bad he was going through withdrawals, yet nothing was done[]" Doc. 35 ¶ 18. However, in his response to Defendants' statement of undisputed facts, McPeek contends that he was called to Health Services for shoulder, knee, foot, and ankle pain, and when he attempted to address the withdrawal symptoms, he was told he needed to put in a kite to be seen for withdrawal symptoms. Doc. 56 ¶ 175.

McPeek asserts that on February 2, 2023, his mental health counselor was concerned about his well being because of the withdrawal symptoms he was exhibiting, but when he was seen by medical around February 2, 2023, nothing was done. Doc. 56 ¶ 177; Doc. 18 at 9 ¶ 6. McPeek submitted a grievance dated February 25, 2023, asserting that the "DOC's medical provider tapered [him] off in one week knowingly taking [him] off this medication so quickly would cause [him] extreme withdrawals including [his] brain shaking, eyes twitching, irritability, anxiety, stress, impaired motor function, pain, etc." Doc. 56-1 at 45. McPeek's appeal was denied because "Health Services and Behavioral Health ha[d] not received kites from [him] regarding the referenced symptoms." Id. at 47. McPeek was instructed that "[m]edical and behavioral health

---

[1] Often, McPeek alleges what he reported to "medical" or what "medical" told him, but he does not identify any specific provider. "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be individually assessed." Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006) (citing Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) (en banc)). Thus, when considering Defendants' motion for summary judgment, this Court need only consider what McPeek reported to CNP Paul or Dr. Haynes or of what the named Defendants were otherwise aware.

related concerns should be reported to the respective departments so the issue may be promptly addressed." Id.

After the decision was made to discontinue Lyrica, McPeek continued to be seen by Health Services. Doc. 49 ¶ 174; Doc. 56 ¶ 174. But none of the records from his subsequent encounters mention blackouts, seizures or any other side effects due to the discontinuation of Lyrica. Doc. 49 ¶ 177. On January 26, 2023, McPeek submitted a kite-request for sneezing and coughing, but did not mention any blackouts, seizures, or other withdrawal symptoms. Doc. 45-75. When he was assessed during sick call the next day, he did not report any withdrawal symptoms. Doc. 45-76. In early March, he submitted a kite-request complaining of MRSA[2] on his left thigh and hip area, but he did not report any withdrawal symptoms. Doc. 45-77. The next day, when a provider saw McPeek, he did not report any withdrawal symptoms. Doc. 45-78.

## DISCUSSION

### I.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (citation omitted). There is a genuine issue of material fact if "a reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that

---

[2] MRSA is the acronym for Methicillin-resistant Staphylococcus aureus, a bacteria that causes certain difficult-to-treat infections.

a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

## II.    Eighth Amendment Deliberate Indifference to Unsafe Conditions of Confinement

### A.    Individual Capacity Claim Against Wasko

McPeek contends that he contracted COVID-19 on October 22, 2020, because of Wasko's alleged deliberate indifference to unsafe conditions of confinement. Doc. 35 ¶ 9. But Wasko did not become the Secretary of Corrections until May 7, 2022. Doc. 46 ¶ 1. "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990); see also Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (to be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights). It is undisputed that Wasko was not personally involved in or directly responsible for the allegedly unsafe conditions of confinement that made McPeek susceptible to COVID-19. Accordingly, Wasko is entitled to summary judgment on McPeek's individual capacity Eighth Amendment claim for deliberate indifference to unsafe conditions of confinement.

### B.    Individual Capacity Claim Against Fluke

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.'" Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). The Supreme Court has instructed that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation omitted).

11

Basic human needs, according to the Supreme Court, include "food, clothing, shelter, medical care, and reasonable safety." Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal quotation omitted).

To state a claim that Fluke failed to protect him from harm in violation of the Eighth Amendment, McPeek must allege facts showing that (1) the conditions of his confinement create a substantial risk of serious harm, and (2) Fluke was deliberately indifferent to his health or safety. Williams, 49 F.3d at 445 (quoting Farmer, 511 U.S. at 834, 837); Blevins v. Schnell, 2021 WL 5088164, at *2 (D. Minn. Sept. 15, 2021). The first prong is considered objectively, but the second prong is subjective and requires McPeek to demonstrate that Fluke acted with a "sufficiently culpable state of mind." Blevins, 2021 WL 5088164, at *2 (quoting Farmer, 511 U.S. at 834). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." Kulkay v. Roy, 847 F.3d 637, 643 (8th Cir. 2017) (cleaned up and citation omitted). Satisfying the subjective prong requires more than a showing of "mere negligence." Id. McPeek must demonstrate that Fluke had a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009) (internal quotation omitted).

McPeek contracting COVID-19 while incarcerated at MDSP does not establish that then-Warden Fluke was deliberately indifferent. Frohlich v. United States, 2021 2531188, at *3 (D. Minn. June 6, 2021) ("The mere fact that COVID-19 spread at FCI Sandstone does not mean that the facility was deliberately indifferent."); Blevins, 2021 WL 5088164, at *4 ("[T]he fact that inmates have been infected with COVID-19 is not enough on its own to show that Defendants behaved unreasonably in response to the risks presented by the virus."); Coates v. Arndt, 2020 WL 6801884, at *2 (E.D. Wis. Nov. 18, 2020) ("The plain fact is that the country is experiencing a pandemic and cases of COVID-19 are breaking out in prisons . . . . This does not mean that the

12

correctional officers in charge of those prisons are subjecting inmates to cruel and unusual punishment.").

Contrary to McPeek's assertions, the failure to comply with CDC guidelines does not violate the Eighth Amendment. Choate v. Runion, 2022 WL 3908836, at *7 (W.D. Ark. Aug. 30, 2022); see also Mayfield v. Peissig, 2020 WL 3414757, at *2 (W.D. Wis. June 22, 2020) ("[G]eneral allegations about a lack of social distancing and inconsistent mask use at the prison do not suggest that the conditions of . . . confinement are inhumane or that defendants are acting with deliberate indifference to a significant risk of harm to plaintiff's health or safety."). This Court's role is not to assess whether MDSP could have done more to combat the COVID-19 virus. Rather, this Court's role is limited to determining whether the named Defendants have "made the requisite showing that [their] efforts to combat COVID-19 satisfied the constitutionally required minimum." Valentine v. Collier, 978 F.3d 154, 158 (5th Cir. 2020). Fluke has made such a showing. It is undisputed that vaccinations were offered and made readily available to staff and inmates, and staff were screened for symptoms before each shift and required to wear a mask. Doc. 49 ¶¶ 37, 38, 39. All inmates were issued masks and required to wear them when they were out of their rooms. Id. ¶ 39. Steps were taken to limit interaction between inmates, and hand sanitizers were made available to inmates to use. Id. ¶¶ 40, 42, 44, 45.

McPeek disputes that he was provided two personal bars of soap. That prison officials may not have followed MDSP's policy to provide two personal bars of soap does not state a claim under § 1983. Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for violating prison policy."). Further, supervisory prison officials are not liable under § 1983 merely because their subordinates have engaged in unconstitutional conduct. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). Because § 1983 does not give rise to respondeat superior liability, McPeek

13

must demonstrate that Fluke, through his own actions, violated McPeek's constitutional rights. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). McPeek has not submitted any evidence that Fluke was aware that McPeek or any other inmate was not being provided two personal bars of soap. Further, McPeek has not submitted any evidence that Fluke was aware that sharing bar soap significantly increases the risk of contracting COVID-19. Thus, any factual dispute whether McPeek was provided two personal bars of soap is not a material issue of fact. Erickson v. Nationstar Mortg., LLC, 31 F.4th 1044, 1048 (8th Cir. 2022) (recognizing that a fact is not material unless it may affect the outcome of the lawsuit).

McPeek also disputes that he was provided thermal tops and bottoms. Doc. 35 ¶ 14. But it is undisputed that McPeek was provided a parka with a hood and permitted to wear a stocking cap during the fall and winter. Doc. 45-24; Doc. 49 ¶¶ 48, 78, 79, 80; Doc. 56 ¶¶ 78–80. During inclement weather, McPeek is required to be outside only for the short period of time it takes to walk from his housing unit to Health Services or the Dining Hall. Doc. 63 ¶ 10. McPeek asserts that the "warmth provided by thermals will reduce the chances of inmates getting sick" and contends that when his head and ears get cold during the months he is not permitted to wear a stocking hat, he is more susceptible to getting sick. Doc. 56-1 at 9, 12. McPeek has not submitted evidence to support these assertions. Indeed, McPeek has not proffered any evidence that Fluke was aware that exposure to cold increases susceptibility to COVID-19. Defendants, on the other hand, have provided medical evidence that exposure to cold weather does not make one more susceptible to viruses. Doc. 62 ¶¶ 64–66. Thus, there is no evidence that Fluke was deliberately indifferent to a significant risk to McPeek's health or safety because McPeek was not provided thermal tops and bottoms or permitted to wear a stocking cap on cold days in the spring and summer.

14

McPeek relies on Gordon v. Faber, 800 F. Supp. 793 (N.D. Iowa 1991), aff'd, 973 F.2d 686 (8th Cir. 1992), to argue that the failure to provide him a stocking cap and thermal tops and bottoms constitutes deliberate indifference. See Doc. 57 at 10. Gordon is inapposite. In Gordon, inmates were forced to spend one hour to one hour forty-five minutes outside in subfreezing weather in February with a significant wind chill wearing only lined denim coats with no hood, hats, or gloves. 973 F.2d at 687. In this case, it is undisputed that McPeek was provided a parka with a hood and gloves and was permitted to wear a stocking cap in February when he was required to be outside for a short period of time to walk from his housing unit to health services or the dining hall.

Finally, even assuming as McPeek alleges, that he continues to experience symptoms attributable to his October 2020 COVID-19 diagnosis, ongoing symptoms are not relevant to McPeek's claim that he contracted COVID-19 because Fluke was deliberately indifferent to a significant risk prior to October 2020 that McPeek would contract COVID-19. For these reasons, Fluke's motion for summary judgment on McPeek's Eighth Amendment deliberate indifference to unsafe conditions of confinement against him in his individual capacity is granted.

## III. Eighth Amendment Deliberate Indifference to Serious Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). But not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. Jolly v. Knudsen,

205 F.3d 1094, 1096 (8th Cir. 2000) (citing <u>Estate of Rosenberg v. Crandle</u>, 56 F.3d 35, 37 (8th Cir. 1995)).

The deliberate indifference standard includes both an objective and subjective component. <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing <u>Coleman v. Rahija</u>, 114 F.3d 778, 784 (8th Cir. 1997)). "The plaintiff[] must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." <u>Id.</u> (citing <u>Coleman</u>, 114 F.3d at 784). The plaintiff must show that the defendant's mental state was "akin to criminal recklessness." <u>McCaster v. Clausen</u>, 684 F.3d 740, 746 (8th Cir. 2012) (quotation omitted). When evaluating whether a defendant displayed deliberate indifference to a plaintiff's serious medical needs, a court considers the defendant's "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position[,] and alternative courses of action that would have been apparent to an official in that position." <u>Letterman v. Does</u>, 789 F.3d 856, 862 (8th Cir. 2015) (quoting <u>Gregoire v. Class</u>, 236 F.3d 413, 419 (8th Cir. 2000)).

CNP Paul and Dr. Haynes do not dispute that McPeek's fibromyalgia is a serious medical need. Rather, they argue that they are entitled to summary judgment because there is no evidence that they deliberately disregarded his medical needs. It is well established that McPeek does not have a constitutional right to any particular type of treatment, including a specific pain medication. <u>Long v. Nix</u>, 86 F.3d 761, 765 (8th Cir. 1996); <u>Harris v. Gusman</u>, 2019 WL 6770021, at *4 (E.D. La. Dec. 12, 2019) ("[A] prisoner has no constitutional right to be prescribed a particular pain medication, and the mere fact that he disagrees as to which pain medication is appropriate simply is not actionable under § 1983."); <u>Swafford v. Tiggs-Brown</u>, 2018 WL 7395164, at *8 (C.D. Cal. Oct. 22, 2018) ("Abundant case law explains that an Eighth Amendment deliberate indifference

claim cannot be based upon a disagreement over the type and dosage of medication prescribed, and that an inmate is not entitled to his or her medication of choice.") report & recommendation adopted by 2019 WL 914123 (C.D. Cal. Feb. 22, 2019). McPeek's disagreement with the management of his pain complaints is insufficient to establish deliberate indifference. Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) ("[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." (internal quotation omitted)); Steele v. Weber, 278 F. App'x 699, 700 (8th Cir. 2008) (per curiam) (affirming grant of summary judgment against plaintiff when prison staff refused to continue prescribing high-dose narcotic pain medication he was prescribed before incarceration because prison doctors believed that the pre-incarceration level of medication was harmful for plaintiff and was a mere disagreement with treatment).

CNP Paul, as a matter of law, cannot be liable for failing to prescribe Lyrica when it was no longer formulary. Bender v. Regier, 385 F.3d 1133, 1138 (8th Cir. 2004) (recognizing that a provider cannot be found to have acted with deliberate indifference by not providing treatment he or she did not have the authority to provide). Dr. Haynes cannot be liable for refusing a non-formulatory request for Lyrica because McPeek does not have a constitutional right to receive a requested course of treatment. See Barr v. Pearson, 909 F.3d 919, 921 (8th Cir. 2018). "[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford, 614 F.3d at 460.

McPeek alleges that his Lyrica was discontinued without "any plan for caring for him." Doc. 35 ¶ 20. But the record demonstrates otherwise. It is undisputed that interventions other than Lyrica such as exercise, physical therapy, joint injections, surgery, NSAIDS, Tylenol, TENS unit, dietary supplements, and sodium channel modulators are used as part of a multimodal pain management approach for inmates experiencing chronic pain. Doc. 49 ¶ 145; Doc. 56 ¶ 145. After

17

McPeek's Lyrica was discontinued, CNP Paul offered Cymbalta, physical therapy, and use of a

TENS unit during an appointment on February 10, 2023. Doc. 45-74 ¶ 5; Doc. 45-82 at 6. While

McPeek may not have received his treatment of choice for fibromyalgia, CNP Paul and Dr. Haynes

offered other modalities to alleviate McPeek's symptoms.

> According to McPeek's response to Defendants' motion for summary judgment:

> He does not like being in pain all day. He does not like feeling like he has pins and
> needles poking into his skin including his face, arms, legs, back and chest. He does
> not like nerve pain that feels like his muscle is being ripped from the bone. He does
> not enjoy these feelings of pain and how it affects his energy, mood, mental health,
> energy levels, and his motivation.

Doc. 57 at 11. But McPeek has not submitted any evidence that the medical Defendants, CNP

Paul and Dr. Haynes, were aware that he was experiencing these symptoms after Lyrica was

discontinued. None of the medical kite-requests and medical records after discontinuation of

Lyrica mention any of the complaints McPeek detailed in his responsive brief. McPeek asserts

that Defendants have not provided his complete medical record and have purposefully left out

"favorable medical records" to prejudice him. Doc. 57 at 3. SDDOC's Offender Health Records

Policy (700-28) permits McPeek to "review specified health records . . . used to make medical

decisions about the offender and receive copies of these records, unless providing such copies or

access to the records would result in risk to the health or safety of the offender, staff, or others."

Doc. 64-1 at 3. McPeek has not provided any evidence that he has submitted a request to review

and copy any of his DOC medical records. Further, this Court denied in part Defendants' motion

for protective order and permitted McPeek to conduct limited discovery, including discovery of

medical records he contended were necessary to respond to Defendants' motion for summary

judgment. See Doc. 65. This Court also permitted McPeek to serve a supplemental response to

Defendants' statement of undisputed material facts after receiving the requested discovery. Id. at

6; see also Doc. 67. McPeek's supposition about missing medical records does not create a genuine issue of material fact on deliberate indifference to serious medical need to justify denying Defendants' motion for summary judgment.

McPeek alleges that CNP Paul and Dr. Haynes attempted to give him Cymbalta although they knew that it causes an allergic reaction. See Doc. 35 ¶ 20. McPeek "self-reported" an allergy to Cymbalta, but there is no evidence that Dr. Haynes or CNP Paul were aware that McPeek had a medically documented allergy when they offered this medication. Doc. 49 ¶ 149; Doc. 44-28. Prior to his incarceration, McPeek had been prescribed Cymbalta while being treated by Siouxland Community Health Center in Sioux City, Iowa. Doc. 48 ¶ 148. McPeek contends that Cymbalta was prescribed for mood, not chronic pain, and that he got sick and had side effects. Doc. 56 ¶ 148. The Siouxland Community Health Center records do not mention side effects or an allergic reaction. Doc. 49 ¶ 148; Doc. 56-1 at 53. Thus, McPeek has failed to come forward with any competent evidence that CNP Paul or Dr. Haynes had a state of mind akin to criminal recklessness when they recommended Cymbalta as an alternative to Lyrica for treatment of fibromyalgia. Similarly, there is also no evidence to support McPeek's allegation that CNP Paul and Dr. Haynes were aware that he was experiencing serious, life threatening withdrawals for almost a month after being tapered off Lyrica and did nothing to help him. See Doc. 45-74; Doc. 56-1 at 45 , 47, Doc. 49 ¶¶ 175, 177.

Accordingly, CNP Paul and Dr. Haynes are entitled to summary judgment on McPeek's claims against them in their individual capacities for deliberate indifference to a serious medical need.

## IV.    Official Capacity Claims

McPeek brings official capacity claims against Wasko; Alex Reyes,[3] the acting warden at

MDSP; Dr. Haynes, and CNP Paul.  He requests that this Court enter a permanent injunction[4]

ordering Defendants:

- to place anti-bacterial soap dispensers in the restrooms at MDSP;

- to issue or allow inmates at MDSP to purchase thermal tops and bottoms;

- to reduce the number of inmates per room/cell at MDSP;

- to require all staff at MDSP to be fully vaccinated from COVID-19 and other highly contagious diseases;

- to abide by the CDC's social distancing guidelines while inmates at MDSP are in line, during count, and eating;

- to prohibit MDSP staff with signs of illness from working around inmates;

- to provide chronic medical care to McPeek for preexisting conditions; and

- to prescribe and pay for Lyrica for McPeek during his incarceration at MDSP.

Doc. 35 ¶¶ 25–33.

The United States Court of Appeals for the Eighth Circuit has instructed that "in the prison

context, a request for injunctive relief must always be viewed with great caution because 'judicial

restraint is especially called for in dealing with the complex and intractable problems of prison

administration.'"  Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (quoting Rogers v. Scurr, 676

F.2d 1211, 1214 (8th Cir. 1982)).  Here, McPeek requests that the Court provide "precise

directions" to MDSP to minimize the risk of exposure to COVID-19 and to manage an inmate's

---

[3] After this action was commenced, Fluke, who was the Warden at MDSP, was appointed to serve as the Deputy Director of Prison Operations for the SDDOC.  See Doc 47 ¶ 1.  In accordance with Fed. R. Civ. P. 25(d), Alex Reyes, the acting Warden at MDSP, was substituted for Fluke on the official capacity claims.  Doc. 54 at 2.
[4] This Court denied McPeek's motion for a preliminary injunction.  Doc. 12 at 13–15.

specific, chronic medical condition. The Eighth Circuit disapproves of injunctions "intru[ding] into the daily affairs and operations of state prisons." See, e.g., Rogers, 676 F.2d at 1214; see also Lewis v. Casey, 518 U.S. 343, 364 (1996) (Thomas, J., concurring) ("The Constitution charges federal judges with deciding cases and controversies, not with running state prisons. Yet, too frequently, federal district courts in the name of the Constitution effect wholesale takeovers of state correctional facilities and run them by judicial decree.").

More fundamentally, however, § 1983, the statute under which this action was commenced, provides that no liability ensues unless the plaintiff demonstrates "deprivation of . . . rights . . . secured by the Constitution." 42 U.S.C. § 1983. As the Eighth Circuit has held, "in the absence of a clear showing of such a deprivation, there is no predicate" for any relief, including injunctive relief. Rogers, 676 F.2d at 1214; see also Falls v. Nesbitt, 966 F.2d 375, 380 (8th Cir. 1992) ("We have no Constitutional violation; therefore, the use of an injunction is unnecessary since the conduct sought to be enjoined no longer represents a claim which violates the Eighth Amendment."). Because McPeek has not demonstrated any violation of his Eighth Amendments rights, he is not entitled to injunctive relief. Defendants' motion for summary judgment on the official capacity claims is granted.

For these reasons stated above, it is

ORDERED that Defendants' motion for summary judgment, Doc. 44, is granted.

DATED this **17ᵗʰ** day of March, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE